IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen L. Kraft,                                 :
                          Petitioner              :
                                                  :
        v.                                        :  No. 1125 C.D. 2017
                                                  :  ARGUED:  April 12, 2018
Unemployment Compensation                         :
Board of Review,                                  :
                          Respondent              :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                  FILED:  June 13, 2018


        Stephen Kraft (Claimant) petitions for review of the August 2, 2017 order of

the Unemployment Compensation Board of Review (Board), affirming the Referee's

denial of unemployment compensation (UC) benefits under Section 402(e) of the

Unemployment Compensation Law (Law)[1] for willful misconduct.  We affirm.

## Background

        Claimant was employed as a truck driver by Allen Distribution (Employer)

from August 19, 2005 until March 3, 2017.  Notes of Testimony (N.T.), 5/30/17, at

9.  On March 2, 2017, Claimant was responsible for training a new driver ("Trainee")

who had been with Employer three days.  N.T., 6/13/17, at 9-10, 33.  During that

shift, Claimant told the Trainee, "I am n****r number one.  [A Caucasian co-worker]

_____

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §
802(e).

is n****r number two.  You can be n****r number three."  Referee Decision, Finding of Fact (F.F.) No. 6.  Claimant is also Caucasian, and the Trainee is African American.  Claimant also called the Trainee an "idiot" at some point during the shift. N.T., 6/13/17, at 42.

The next morning, the Trainee reported the incident to Mike Egbert, Employer's Director of Transportation. N.T., 6/13/17, at 8.  Mr. Egbert forwarded the complaint to Tonya Karcher, Employer's Human Relations (HR) Director, who initiated an investigation.  *Id.* at 7-8.  Pursuant to that investigation, Ms. Karcher and Mr. Egbert met with Claimant.  *Id.* at 8.  During that meeting, Claimant admitted he used the racial slur several times and called the Trainee an idiot.  *Id.* at 10.  Claimant further acknowledged what he did was wrong.  *Id.*  At the conclusion of the meeting, Claimant was suspended from work pending the results of the investigation.  *Id.*  Ms. Karcher also spoke with the Trainee as part of her investigation.  *Id.* at 11.  After completing her investigation, Ms. Karcher notified Claimant on March 7, 2017 that he was terminated for violating Employer's **anti-harassment policy** (Policy).  *Id.* at 12.

Claimant filed for UC benefits on March 9, 2017.  Certified Record (C.R.), Internet Initial Claims, Item No. 2 at 1.  In his initial claim, Claimant acknowledged that he was discharged for violating a rule (the Policy), he was aware of the rule, and it was uniformly enforced.  *Id.* at 2.  Claimant listed "racial slur in the work place" as the reason for the rule violation.  *Id.* at 3.  On April 20, 2017, Claimant received a determination from the Erie UC Service Center (Service Center) that denied his request for UC benefits pursuant to Section 402(e) of the Law because he committed willful misconduct in violating a workplace rule.  C.R., Notice of Determination, Item No. 5.

2

Claimant filed an appeal on May 5, 2017, asserting that the situation was misrepresented and he was wrongfully terminated. C.R., Claimant's Petition for Appeal, Item No. 6. Hearings were held before the Referee on May 30, 2017 and June 13, 2017.

On June 16, 2017, the Referee issued a Decision and Order, affirming the determination of the Service Center. C.R., Referee's Decision, Item No. 14 at 3. The Referee credited the testimony of Employer's witnesses that a Policy existed which prohibited the use of nicknames, slurs or negative stereotyping, and demeaning jokes. *Id.* at 2. The Referee further found that Employer established that Claimant should have known of the Policy and that Claimant admitted the behavior, which was a clear violation of the policy. *Id.* The Referee concluded Claimant was discharged for committing willful misconduct and was consequently ineligible for benefits under Section 402(e) of the Law. *Id.*

Claimant appealed to the Board, arguing Employer's Policy was not uniformly and consistently applied, Claimant was not given reasonable notice that a single incident would result in termination, and the Referee's decision was not supported by substantial evidence. C.R., Claimant's Petition for Appeal, Item No. 15. By Order with a mailing date of August 2, 2017, the Board adopted the Referee's findings of fact and conclusions and affirmed. C.R., Board's Order, Item No. 19 at 1-2. This appeal followed.

## Issues

Claimant's asserted errors are disjointed, vague, and at times confusing, however we discern the following to be the Claimant's key issues on appeal:

1. The Board erred in finding he was discharged for willful misconduct after violating Employer's Policy because certain findings were not supported by substantial evidence.

2. Other employees who used similar racial slurs and stereotypes were not terminated for their conduct.

3. As Employer permitted such behavior, Claimant was not on notice that a single violation of the Policy would result in his termination.

## Discussion[2]

Section 402(e) of the Law provides that *"[a]n employe shall be ineligible for compensation for any week… [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work…"* 43 P.S. § 802(e). Willful misconduct has been defined by the courts as behavior evidencing a willful disregard of an employer's interest, a deliberate violation of an employer's work rules, and/or a disregard of the standards of behavior an employer can rightfully expect from its employees. *Patla v. Unemployment Comp. Bd. of Rev.*, 962 A.2d 724, 727 (Pa. Cmwlth. 2008). The burden to show a claimant committed willful misconduct falls on the employer. *Guthrie v. Unemployment Compensation Board of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999). If the employer proves the existence of the rule, the reasonableness of the rule, and the fact of its violation, the burden then shifts to the claimant to prove he had good cause for his actions. *Id.* at 522.

---

[2] This Court's review is limited to a determination of whether constitutional rights were violated, errors of law were committed, or findings of fact were not supported by substantial evidence. *Oliver v. Unemployment Compensation Board of Review*, 5 A.3d 432, 438 n.2 (Pa. Cmwlth. 2010).

4

Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Bethenergy Mines v. Workmen's Comp. Appeal Bd. (Skirpan)*, 612 A.2d 434, 436 (Pa. 1992) (quoting *Republic Steel Corp. v. Workmen's Comp. Appeal Bd. (Shinsky)*, 421 A.2d 1060, 1062-63 (Pa. 1980)). In performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party who prevailed before the factfinder. *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Products, Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998).

Employer's Employee Handbook Section 1.3 sets forth the Policy that prohibits **harassment** of any sort – verbal, physical, or visual – and provides that such conduct will be investigated. N.T., 5/30/17, Ex. 8. Per the Policy, harassing conduct includes racial slurs, negative stereotyping, demeaning jokes, and other verbal contact that creates an intimidating, hostile, or offensive working environment. *Id.* Prohibited harassment may include a hostile work environment based on race. *Id.* Section 1.3.1 also states that any employee found to have harassed a fellow employee will be subject to disciplinary action, **including discharge**. *Id.* This Policy does not specifically provide for progressive discipline for violations.

When Claimant initially filed for UC benefits on March 9, 2017, he acknowledged that he was discharged for having violated the Policy, that he was aware of the Policy, and that he violated the Policy. C.R., Internet Initial Claims, Item No. 2 at 2. At the May 30, 2017 hearing before the Referee, Employer presented an acknowledgment of receipt of the Employee Handbook signed by Claimant. N.T., 5/30/17, Ex. 7. Claimant admitted he received a copy of the Employee Handbook when he began his employment. N.T., 6/13/17, at 38. Claimant testified that, when he received the Employee Handbook, he was "rushed,"

5

he signed the acknowledgment and "[threw] it in the back of the truck, and never read it." *Id.* When asked why he never read the Employee Handbook, Claimant testified that "at the end of the day you're tired and when do you have time to read it." *Id.* at 39. As to whether Claimant had any awareness of the Policy prior to March 3, 2017, Claimant said he "might have seen across it." *Id.* at 39.

The existence of Employer's Policy prohibiting harassment cannot be seriously questioned. It is clear from the uncontroverted evidence of record that Claimant was aware, or should have been aware, of the Policy. His failure to read the Employee Handbook does not absolve him of any obligation to abide by its contents. Further, Claimant admitted, both in his initial filing for UC benefits and during testimony, that he was aware of the Policy's existence. The Board's findings that Employer had a Policy which prohibited harassment and that Claimant should have been aware of the Policy are supported by substantial evidence.

Claimant next argues that he is aware of other co-workers who used racial slurs/stereotypes, but only received verbal reprimands. In essence, Claimant is arguing that he was treated in a disparate manner and thus his termination was improper.

Disparate treatment is an affirmative defense by which a claimant who has engaged in willful misconduct may still receive benefits. *Geisinger Health Plan v. Unemployment Comp. Bd. of Rev.*, 964 A.2d 970, 974 (Pa. Cmwlth. 2009). The mere fact that one employee is discharged for willful misconduct and others are not discharged for the same conduct does not, by itself, establish disparate treatment. *Am. Racing Equip., Inc. v. Unemployment Comp. Bd. of Rev.*, 601 A.2d 480, 483 (Pa. Cmwlth. 1991). In order to prove disparate treatment, a claimant must make an

6

initial showing[3] of **each** of the following:  1) the employer discharged claimant but did not discharge other employees who engaged in similar conduct; 2) the claimant was similarly situated to the other employees who were not discharged; and 3) the employer discharged the employee based on an improper criterion.  *Geisinger*, 964 A.2d at 974.

It is important to emphasize, at the outset, that Claimant was not fired for using racial slurs alone.  Claimant was fired for creating a hostile work environment by using racial slurs and other derogatory language directed towards the Trainee. The Employer deemed this conduct to constitute "harassment," pursuant to its Policy.  It is undisputed that Claimant's behavior created a hostile work environment since the Trainee was offended enough to immediately report Claimant's conduct to Human Resources.  Additionally, while Claimant ultimately equivocates on whether he actually used racial slurs, and explains that he was joking when he called the Trainee an idiot, it is clear that both the Referee and the Board determined that Claimant had made racial slurs.

In support of his assertion of disparate treatment, at the hearing, on direct examination by his attorney, Claimant answered in the affirmative when he was asked if he had ever heard racial slurs made by other drivers in the workplace. N.T., 6/13/17, at 42.  However, Claimant failed to explain this further and did not testify, nor present any other evidence, establishing the context or circumstances of these alleged incidents. Claimant only refers to a **single specific** incident as evidence of Employer's disparate implementation of the Policy.  Claimant testified he was

---

[3] *Geisinger* and its progeny do not specifically set forth the standard of proof besides the requirement that a claimant make an "initial showing" of each of the three prongs.

present when truck driver, Lou Williams, was simply admonished for referring to the Trainee as "brother."[4] N.T., 6/13/17, at 46.

There is evidence in the record which reveals that other truck drivers who worked for Employer did in fact use racial slurs and they were corrected or reprimanded, but not fired. At the Referee's hearing, Ms. Joann Drey, Employer's Lead Operations Manager, testified that she was aware of some instances where drivers used racial slurs. N.T., 6/13/17, at 51. Ms. Drey stated that the particulars of each situation dictated her responses, such as if an offensive comment was made directly to another person, *id.* at 52, but she never found it necessary to formally report those instances and she was not aware of any other employee terminated for such conduct. *Id.* at 51.

Additionally, Mr. Egbert testified that, while he had never personally heard employees using racial slurs, he was aware that racial slurs had been uttered by some employees in the past, since these instances were reported to him by Ms. Drey. N.T., 6/13/17, at 57-58. According to Mr. Egbert, if such conduct occurred outside the dispatch area, it was out of his control, but if something happened in the office/dispatch area, it was addressed immediately. *Id.* at 57. In past situations of this nature, Ms. Drey would report to Mr. Egbert the use of inappropriate language and any action taken by her.

---

[4] Lou Williams was the "Caucasian employee" that Claimant was referring to as "n****r number 2." N.T., 6/13/17, at 46. This was the same incident in which Mr. Williams also referred to the Trainee as "brother." *Id.* at 49. Mr. Williams' conduct was also investigated. *Id.* at 35. Mr. Williams was ultimately fired, for reasons unknown, but apparently unrelated to this incident where he called the Trainee "brother." *Id.* at 60.

[Claimant's Counsel]: [W]hat would that action be that she would take?

[Mr. Egbert]: She shuts it down right there at the window such as, that's not appropriate language, we don't use that. Then if it is not repetitive then it pretty much ends there.

N.T., 6/13/17, at 58.

In explaining her rationale for terminating Claimant for this incident, Ms. Karcher testified at the hearing that Claimant used the slur multiple times during the incident with Trainee. N.T., 6/13/17, at 31. Ms. Karcher further stated that the Employer is obligated to "create an environment where individuals can come to work and are free from that type of behavior" and that her investigation revealed that Claimant's actions created a hostile work environment. *Id*.

Claimant has, quite simply, failed to satisfy his burden of proving the second or third prongs of the disparate treatment test - namely that the Claimant was similarly situated to the other employees who were not discharged for similar misconduct and that he was fired based on improper criterion.

Racial slurs, by their very nature, constitute offensive conduct. It bears repeating here though, that Claimant was not terminated for simply using racial slurs. He was terminated for **harassing** another employee whom Claimant **was responsible for training,** when he used racial slurs and another derogatory remark (calling Trainee an "idiot"). In doing so, Claimant created a hostile work environment such that Trainee felt the need to immediately report Claimant's conduct. The fact that other employees were reprimanded for their use of racial slurs is only relevant, in this particular analysis, if their use of such language constituted harassment and created a hostile work environment, which is expressly prohibited by Employer's Policy. **Claimant had a full and fair opportunity over the course of two hearings to develop the record in this regard and failed to do so.**

9

Consequently, we conclude that Claimant has not established that he was similarly situated to other employees who were not fired for using racial slurs and has not met his burden of proving that he was treated in a disparate manner.

Claimant also cites the incident with Mr. Williams as evidence that his expectation of progressive discipline, rather than immediate termination, was reasonable. Claimant relies on the rule established by this Court in *Looney v. Unemployment Compensation Board of Review*, 529 A.2d 612, 614 (Pa. Cmwlth. 1987), that a claimant's actions may not be considered willful misconduct if the employer has not adhered to its progressive disciplinary system when discharging the claimant. In *Looney*, the employer instituted a policy whereby any employee who failed to notify an immediate supervisor that he or she would be absent from work would be subject to progressive discipline. *Id.* at 613. Warnings would be issued for the first two instances, with a third instance resulting in termination. *Id.* The claimant in *Looney* was terminated after a first offense. *Id.* This Court determined he could not be deprived of benefits because the employer failed to follow its progressive discipline policy. *Id.* at 614.

Claimant's reliance on *Looney* is misplaced. The Policy at issue in the instant matter does not provide for progressive discipline. The Policy explicitly states that any employee found to have harassed a fellow employee will be subject to disciplinary action, including discharge. Employer clearly contemplated a policy of progressive discipline for some behaviors, as the Employee Handbook explicitly employs such a system for absenteeism. N.T., 6/13/17, Ex. C2 at 17. Conversely, any employee committing an act of theft is subject to immediate termination. *Id.* at 12. As to harassment, however, the Policy generally subjects violators to discipline, which could include termination. *Id.* at 2. Claimant cannot realistically claim an

10

entitlement to progressive discipline under the express terms of the Policy.[5] And finally, it goes without saying that Claimant's offensive conduct does not remotely compare to Mr. Williams calling the Trainee "brother."

While Claimant is correct that an employer must follow its own progressive discipline policy, Claimant has failed to establish that one existed in regard to the Policy at issue.

## Conclusion

Substantial evidence exists which supports the Board's findings that Employer had a Policy that prohibited harassment, that Claimant was aware of this Policy, that Claimant violated the Policy when he directed racial slurs at an African-American co-worker and called him an idiot, and that Claimant created a hostile work environment by his conduct towards the Trainee. Claimant presented no evidence establishing he had good cause for violating the Policy. Claimant failed to establish that violations of the Policy were subject to progressive discipline or that Employer implemented the Policy in a disparate manner. Consequently, we discern no error in the Board's conclusion that Claimant committed willful misconduct and is ineligible for UC benefits under Section 402(e) of the Law.

---

[5] In further support of his argument that he had reason to believe Employer had a progressive discipline policy, Claimant points to an instance in which he was suspended without pay for half a day. N.T., 6/13/17, at 44. The relevance of this alleged suspension is questionable, as Claimant has not cited which section of the Employee Handbook was implicated by the discipline imposed and how it relates to the Policy. As Employer clearly contemplates a variety of disciplines for infractions, not all of which result in the imposition of progressive discipline, any penalty imposed for performance-related issues is not pertinent to this discussion. Ms. Karcher testified that Claimant was terminated for violating the Policy because he used the racial slur multiple times, he did not seem to recognize the severity of the violation, and she believed Employer had a legal obligation to create a work environment where individuals would be free from such behavior. N.T., 6/13/17, at 31.

The order of the Board is affirmed.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen L. Kraft,                     :
             Petitioner       :
                           :
      v.                  :  No. 1125 C.D. 2017
                           :
Unemployment Compensation  :
Board of Review,             :
             Respondent   :

## O R D E R

AND NOW, this 13th day of June, 2018, the order of the Unemployment Compensation Board of Review, issued August 2, 2017, is hereby affirmed.

_____
ELLEN CEISLER, Judge

Stephen L. Kraft, :
   Petitioner :
     :
   v. : No. 1125 C.D. 2017
     : Argued: April 12, 2018
Unemployment Compensation :
Board of Review, :
   Respondent :


BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge
    HONORABLE ELLEN CEISLER, Judge
    HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


DISSENTING OPINION BY
SENIOR JUDGE PELLEGRINI     FILED: June 13, 2018


   The issue in this case is not whether it is acceptable for an employee to ever use racial slurs. It never is. The issue is not whether an employer can discharge an employee for using a racial slur. It can. The issue in this case is whether an employee commits willful misconduct by using a racial slur when the employer has tolerated racial slurs in the past. Because an employee obviously cannot commit willful misconduct where an employer has permitted such conduct in the past, I respectfully dissent.

   Steven L. Kraft (Claimant) was employed by Allen Distribution (Employer) as a truck driver from August 19, 2005, until March 6, 2017, for using

racial slurs in the workplace when training a new, African-American driver (Trainee). Specifically, Employer discharged Claimant for violating its anti-harassment policy when he said to Trainee and another employee, "I am n***** number one. [A Caucasian co-worker] is n***** number two. You can be n***** number three." (Referee's Decision/Order, Finding of Fact No. 6 (corrections in original).)[1] Claimant filed for unemployment compensation benefits, which were denied because the use of the racial slur constituted willful misconduct. Claimant appealed.

Before the Referee, the uncontradicted testimony provided was that Employer has **never** fired any of the approximately 70 truck drivers it employs for using "salty" or "foul" language, racial slurs, and/or racial stereotypes in the workplace – despite all such conduct violating its written anti-harassment policy. (*See, e.g.*, Reproduced Record (R.R.) at 80a, 87a-88a.) In fact, Employer's fleet manager, Joann Drey (Drey), admitted that in the last 12 years, she has **never even reported** an employee for such behavior to someone above her in "the chain of command." (R.R. at 80a.)

Notwithstanding Employer's longstanding history of not firing first-time violators of its policy, Human Resource Director Tonya Karcher (Karcher) acknowledged that Claimant was discharged for "basically one incident, the use of … four racial slurs." (R.R. at 62a.) This is despite the fact that Claimant worked for

---

[1] Despite the majority's assertions to the contrary, Claimant was not discharged for creating a hostile work environment or for using the word "idiot." Employer makes no such argument in either its brief on appeal or any other filing, and even the Employer Questionnaire provides that Claimant was discharged because he "used [a] racial slur in the work place. Claimant admitted to the behavior." (Reproduced Record (R.R.) at 5a.) Likely, for this reason, Claimant's use of the word "idiot" is not even referenced in the Service Center, Referee or Board's determinations.

Employer for more than ten years and was never reprimanded for using racial slurs or other derogatory language in the workplace. In fact, Employer's director of transportation, Michael Egbert (Egbert), admitted that he was "surprised" to hear of Claimant's conduct because "it was uncharacteristic of him. There were never any issues prior to that with him." (R.R. at 83a.)

Determining that Claimant using the term "n*****" multiple times during a "joke" that he was telling an African-American coworker violated Employer's anti-harassment policy, the Referee and the Board concluded that Claimant was discharged for willful misconduct and ineligible for benefits under Section 402(e) of the Law, 43 P.S. § 802(e).

In this case, everyone – the Employer, the Referee, the Board and the majority – admits that in all other instances where racial slurs, derogatory terms, and "salty" language were used by truck drivers – all indisputable violations of Employer's anti-harassment policy – no one was fired or even reported to someone higher in the chain of command. Willful misconduct requires an intentional or deliberate disregard of standards of behavior which an employer has a right to expect of an employee. Lack of enforcement or inconsistent enforcement does not establish such a standard of conduct with which it could reasonably expect its employees to comply. *City of Beaver Falls v. Unemployment Compensation Board of Review*, 441 A.2d 510 (Pa. Cmwlth. 1982). Simply, an unenforced work rule is not a work rule but a piece of paper.

In no way do I condone Claimant's use of a racial slur. However, because Employer has uniformly not enforced its work rule to discharge others who have used racial slurs, it cannot rely on its anti-harassment policy to establish that Claimant committed willful misconduct. Accordingly, because I would reverse the Board's order, I respectfully dissent.

_____
DAN PELLEGRINI, Senior Judge